IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ELBERT D. SMITH, II, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.: 3:19-cv-2892-K-BK |
| | § | |
| CITY OF DALLAS, | § | |
| | § | |
| Defendant. | § | |

PLAINTIFF'S SECOND AMENDED COMPLAINT

I.

INTRODUCTION

Plaintiff files this Second Amended Complaint against City of Dallas (Defendant) and respectfully shows as follows.[1]

II.

PARTIES

1.  Plaintiff is an individual and a citizen of Dallas County, Texas.

2.  Defendant is a municipality organized under the laws of the state of Texas with its office at Dallas City Hall, 1500 Marilla Street, Dallas, Texas 75201. Defendant has already been served and has made an appearance.

III.

JURISDICTION

3.  This Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 621, et seq., and 28 U.S.C. § 1331, 1334.

---

[1] Plaintiff files this Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

**Plaintiff's Second Amended Complaint**　　　　　　　　　　　　　　　　　　　　　　　　　　　**Page 1**

IV.

## VENUE

4. Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

5. Dallas County lies within the Dallas Division of the Northern District of Texas, as set forth in 28 U.S.C. § 124(a)(1)/124(c)(3).

V.

## BACKGROUND FACTS

6. Plaintiff, an African-American male, worked for Defendant from September 8, 1995 until January 6, 2020.

7. On December 10, 2013, Plaintiff was promoted to Senior Mechanic.

8. On December 8, 2004, Plaintiff was promoted to Supervisor.

9. On March 9, 2011, Plaintiff was promoted to Maintenance Supervisor IV – Dallas Water Utilities/Pumping ("Supervisor IV"), which was the position Plaintiff maintained until his forced retirement on January 6, 2020.

10. As a Supervisor IV, Plaintiff's responsibilities included interviewing, training, and supervising a workforce engaged with various mechanical, preventative maintenance, and general maintenance projects within the Pumping Division.

11. Plaintiff was the only African American Supervisor IV, among the other five or six employees holding that title.

12. Starting around January 31, 2018, Plaintiff started being harassed by his Supervisor, Lane Cheek.

13. Mr. Cheek frequently subjected Plaintiff to different terms and conditions than the other Supervisor IVs. For example, Mr. Cheek did not allow Plaintiff to make decisions

regarding his subordinates. Mr. Cheek also did not allow Plaintiff to complete or make decisions regarding the hiring process. Mr. Cheek did not interfere or intervene with the other non-African American Supervisor IVs in the way he did with Plaintiff.

14. On February 27, 2018, Plaintiff spoke with Robert Zanca to obtain information and advice on the procedure to file a grievance for harassment, discrimination, and retaliation or intimidation by Defendant. Plaintiff's conversation with Mr. Zanca lasted several hours, as Mr. Zanca attempted to dissuade Plaintiff from filing the grievance.

15. In that meeting, Plaintiff expressed the following concerns, among others: (1) one of the vehicles from Plaintiff's section was taken and given to another section that already had one of his vehicles; (2) Plaintiff was required to complete a form to sign out a Data Collector but a lower level white employee was not required to do so; (3) Plaintiff was routinely treated worse than his white peers; and (4) the disparate treatment made it more difficult for Plaintiff to effectively do his job. At the end of the conversation, Plaintiff chose to file the grievance.

16. During the 22 years prior to his initial grievance, Plaintiff had only received one letter of counsel regarding his work. After filing the grievance, Plaintiff suffered an onslaught of harassment, discrimination, and retaliatory behavior based on his race.

17. The day after filing the grievance, February 28, 2018, Plaintiff received a letter of counsel for alleged poor work performance that purportedly occurred on or around January 31, 2018. In the letter of counsel, Plaintiff was needlessly blamed even though he was not the acting manager responsible for the events giving rise to the letter of counsel. This was the first of many disciplinary actions that Plaintiff faced following the filing of his grievance. Both the timing and the circumstances of the letter of counsel made it clear that it was in retaliation for having filed his grievance.

18. Mr. Cheek began retaliating against Plaintiff following his grievance. Mr. Cheek frequently berated Plaintiff at work regarding updates on situations outside of Plaintiff's control. Despite this, Mr. Cheek yelled and cursed at Plaintiff at work. Plaintiff felt threatened and intimidated by Mr. Cheek's action and told Mr. Cheek that it was inappropriate to speak to him in that manner at work.

19. For example, on March 1, 2018, Mr. Cheek confronted Plaintiff in his office, demanding an update on a situation in the water utilities department. Plaintiff did not have an update for Mr. Cheek because the company responsible for doing the work had been unable to start work due to rainy conditions that week. Mr. Cheek escalated the conversation and started using intimidating and abusive language toward Plaintiff. Christopher Clark, an employee for Defendant as of March 6, 2018, provided a statement about this incident. Mr. Clark reported that Mr. Cheek "began to raise his voice and demand that something be done." Mr. Clark also reported that Mr. Smith "retorted defensively by asking him to lower his voice and not to approach him in a disrespectful manner." Mr. Clark also stated that the last thing he witnessed was Mr. Smith "closing his door and ending the conversation peacefully."

20. On March 12, 2018, Plaintiff filed a grievance concerning the letter of counsel he received on February 28, 2018. Plaintiff explained in the grievance that he was disciplined for pre-audit findings, despite the fact that he was not the acting manager or the Compliance Director. Plaintiff also explained that one of the issues raised in his letter of counsel was a routine inspection that took place on February 16, 2018. Plaintiff was in an offsite training session when that email was sent so he forwarded the email to his supervisors, spoke with them and asked them to take appropriate actions. Plaintiff was assured by his supervisors that it had

been handled. Plaintiff again expressed that he felt like he was being harassed, intimidated, and discriminated against because of his race.

21. Plaintiff did not receive a written response to his March 12, 2018 grievance so he filed another grievance, requesting an appeal to the next level and a grievance hearing.

22. Plaintiff then filed a grievance for the discriminatory and harassing actions taken by Mr. Cheek. Plaintiff spoke to Mrs. Vanessa Jones (Defendant's employee) regarding the grievance. In addition to the discrimination and harassment, Plaintiff also reported Mr. Cheek for vaping at the workplace in violation of City Ordinance and AD 2-15. Although Plaintiff directly told Mr. Cheek about the vaping violation, Mr. Cheek flippantly responded that if Plaintiff did not like the vaping, he should file a grievance. Defendant then denied the grievance against Mr. Cheek, stating that Plaintiff did not need to file a grievance when reporting a violation.

23. Approximately one week after Plaintiff's grievance in March, Plaintiff suffered continued harassment, discrimination, and retaliation at the workplace, in violation of Title VII. Specifically, Plaintiff was singled out in meetings by managers stating that there was a petition by employees to remove a manager, which was directed at Plaintiff because he filed a grievance. Plaintiff filed a grievance regarding this incident, which was denied because "it is not a violation . . . for a manager to meet with subordinate staff and/or to openly discuss concerns that could have a negative impact on the workplace environment."

24. On April 2, 2018, after dealing with constant discrimination, harassment, and retaliation, Plaintiff was placed on work leave by his doctor. Plaintiff's Family Medical Leave Application indicated that he needed to be on work leave from April 2, 2018 until at least May 2, 2018 because he "has experienced severe situational anxiety and panic attacks which he relates to his work related triggers."

Case 3:19-cv-02892-K-BK   Document 26   Filed 10/07/20   Page 6 of 16   PageID 107

25. On April 4, 2018, Mr. Cheek publicly told employees of Plaintiff's medical condition in violation of Defendant's own policy. Plaintiff was informed (by Thomas Greer, John Varner, Carl Littleton, and Kenneth Hannable) that in the meeting, Mr. Cheek publicly stated that employees were not to contact Plaintiff during his time off because he was out of work due to stress.

26. Plaintiff is aware of at least one Caucasian employee of Defendant who took leave from work, in which case Defendant was not allowed to and did not reveal the reason for his sickness. Plaintiff was treated differently because of his race and was retaliated against for filing a grievance with Defendant against Mr. Cheek.

27. Plaintiff attempted to report this act of workplace discrimination, hostile work environment, harassment, and retaliation to Defendant's Human Resources department while he was on leave. However, Defendant's HR department told Plaintiff they could not speak to him regarding the hostile work environment, discrimination, harassment, and retaliation at the workplace until after he returned to work.

28. Following an evaluation on May 2, 2018, Plaintiff's doctor extended his leave of absence until June 4, 2018.

29. When Plaintiff returned to work on June 5, 2018, he filed another grievance concerning the violation of his HIPPA rights during the April 4, 2018 meeting. Plaintiff expressed his concerns that this would further undermine his authority and bring doubt to his mental health and his ability to do his job. Plaintiff's grievance for this breach of privacy was quickly dismissed by Defendant.

30. As soon as Plaintiff returned to work, Plaintiff continued to suffer incessant harassment by Mr. Cheek.

**Plaintiff's Second Amended Complaint**                                                                                              **Page 6**

31. Mr. Cheek sent Plaintiff a text message requesting he send him his time as soon as possible. Plaintiff was in the process of helping another employee with retirement paperwork when Mr. Cheek approached him about his time. Mr. Cheek asked him again a few minutes later, talking down to Plaintiff stating that he had asked him for it three hours prior. When Plaintiff tried to explain that he had just gotten back, Mr. Cheek jumped on the opportunity to ask why Plaintiff had not signed out on the sign out board while he was gone. This sign was completely blank, so Plaintiff's Caucasian counterparts had also not signed out. Plaintiff asked Mr. Cheek if he had asked Eric and Brett to sign out, but Mr. Cheek walked away without a response.

32. Plaintiff filed a grievance for this conduct, but Defendant denied the grievance on the basis that asking Plaintiff several times to submit his time is not a violation of the rules.

33. On June 6, 2018, Mr. Cheek established the "Don Smith Rules." Under these rules, Plaintiff and his peers were required to sign out when they left the office and were required to provide a daily plan to Mr. Cheek by 8:00 AM. Mr. Cheek made it clear to Plaintiff's peers that these rules were being implemented because of Plaintiff's grievance.

34. Plaintiff filed a grievance on June 11, 2018 for Mr. Cheek mocking Plaintiff's Title VII rights when Plaintiff had filed numerous grievances against Mr. Cheek, which were all essentially ignored or excused by Defendant.

35. That same day, Plaintiff noticed that the sign out board had multiple question marks by his name when he returned to the office. He asked Mr. Cheek why there were question marks next to his name. Mr. Cheek responded that it was because Plaintiff did not tell him where he was going. Plaintiff reminded Mr. Cheek that he had sent him an email of his daily plan, so he knew where he was. Plaintiff noticed that Mr. Greer (Caucasian) had been out all day and had not moved his marker. No comments or question marks were placed by his name.

36. On June 22, 2018, Plaintiff again reported Mr. Cheek for vaping in his office. This report was made directly to Assistant Director Randal Payton, since Plaintiff had been told not to file grievances on policy violations.

37. On June 28, 2018, Plaintiff received a letter of counseling indicating that his performance had "fallen to an unacceptable level." This letter gave several examples of instances that Plaintiff had allegedly not performed as expected, dating back to February 21, 2018. When Plaintiff attempted to speak with a superior regarding the letter of counsel, Plaintiff was told that because he refused to sign the letter of counsel, he could not speak about it. Plaintiff was also not allowed to respond to the letter of counsel.

38. On July 5, 2018, Plaintiff received a grievance hearing determination for his complaints about Mr. Cheek's inappropriate behavior on February 28, 2018 and March 1, 2018. The determination essentially stated that no violation of personnel rules was substantiated, but Human Resources may "pursue sensitivity training, improved communication and team building sessions for the supervisory and management team."

39. Because the discrimination and harassment in the workplace had further aggravated Plaintiff's mental condition, on July 9, 2018, Plaintiff's doctor placed him on FMLA leave for one month. His FMLA paperwork for this leave referenced anxiety and panic attacks "due to work and life triggers" that "renders him unable to focus and concentrate well."

40. On July 13, 2018, Plaintiff first contacted the Equal Employment Opportunity Commission ("EEOC") to learn his rights and inquire about filing a Charge of Discrimination. Plaintiff elected not to file a charge at that time because he had a meeting with T.C. Broadnax, the City Manager, in August and wanted to see how that meeting went before taking action.

41. When Plaintiff returned to work on August 9, 2018, he met with Defendant's City Manager to further discuss the hostile work environment, discrimination, retaliation, and intimidation at the workplace. At this meeting, Plaintiff presented a timeline of the specific acts and omissions by Defendant that caused Plaintiff damage, including but not limited to anxiety and panic disorder.

42. On August 17, 2018, Plaintiff received a letter of reprimand falsely accusing him of arguing on a work assignment. The alleged argument was the result of Plaintiff inquiring about the hire of a Mechanical Supervisor and Heavy Equipment Supervisors, both positions that Plaintiff had the authority to fill. Plaintiff was informed that John Varner was handling the process. Plaintiff insisted that he was responsible for the hire because he had started the requisitions and had to complete the process.

43. Plaintiff filed an employee disciplinary appeal for this reprimand, in which Plaintiff explained that the reprimand was false and that he was being discriminated against based on his race because Mr. Cheek refused to allow him to manage his section, like his Caucasian peers were allowed to do. Plaintiff pointed out that Mr. Cheek would constantly undermine his authority as the section supervisor by going to his subordinates for questions about the daily duties of Plaintiff's section.

44. Plaintiff sent an email to the City Manager about the reprimand in retaliation for the complaint.

45. Plaintiff also filed his Charge of Discrimination with the EEOC on September 7, 2018.

46. On September 13, 2018, William Snodgrass, a Senior Mechanic in the Pumping Division, sent an email to the City Manager, seeking his advice regarding the way Plaintiff was

being treated. Mr. Snodgrass forwarded an article about narcissism and the victims of narcissism and related it to what Plaintiff was going through. Mr. Snodgrass expressed that he could "no longer remain silent" because "this is exactly what is happening to . . . Don Smith." Mr. Snodgrass explained that he was "speaking up as a fellow human being to help another who is being railroaded . . . by a group of people in management, who the rules of propriety seem not to apply." Mr. Snodgrass stated that he did not believe HR had the employees' best interest at heart. Mr. Snodgrass wanted to make it clear that this (referring to the most recent reprimand received by Plaintiff) was not an isolated incident and that he could no longer stand by and watch the "repeated overreaches of authority, abuses of power, and blatant disregard for the wellbeing of [his] fellow employee."

47. On September 14, 2018, Defendant was notified by the EEOC of Plaintiff's Charge of Discrimination.

48. In continued retaliation by Defendant, specifically Mr. Cheek, Plaintiff's compensation time was questioned and refused. Whereas, the compensation time of Plaintiff's peer, Mr. Greer, was approved without question.

49. Mr. Cheek completed Plaintiff's FY 2017/2018 Annual Performance Evaluation in or around October of 2018. Mr. Cheek's overall rating of Plaintiff was "Partially Successfully." Mr. Cheek's review of Plaintiff was extremely critical of Plaintiff's performance and personality and included many items that Plaintiff had previously complained that his white peers were not expected to do.

50. Under the integrity/ethics section, in which Mr. Cheek rated Plaintiff as "unacceptable," Mr. Cheek complained that Plaintiff recorded conversations "to protect

himself," which he claimed made some staff uncomfortable or unwilling to communicate with him.

51. Under the Management Objectives category, Mr. Cheek also rated Plaintiff as "unacceptable." Mr. Cheek gave several examples, seemingly mocking Plaintiff's manner of speaking, including:

"I dun told you yesterday"
"Why I got to tell you?"
"It don't matter what I say, you gonna do what you want to do anyway."

Mr. Cheek also made reference to Plaintiff "boastfully report[ing] the filing of his grievances" and telling staff that he "records all conversations and meetings."

52. Under the Special Achievements or Projects section, Mr. Cheek criticized Plaintiff for having problems "adjusting to the new management team" and being "very vocal about his mistrust of management." Mr. Cheek also blamed Plaintiff for "encourag[ing] other staff members to voice negative opinions." Mr. Cheek criticized Plaintiff again in this category for openly discussing the filing of grievances and encouraging others to do the same.

53. On January 31, 2019, Defendant's representatives Mr. Donovan, Mr. Anderson, and Mr. Cheek called Plaintiff into a meeting to attack him based on incorrect and discriminatory statements by Mr. Cheek and Mr. Donovan.

54. Thereafter, on February 14, 2019, Plaintiff filed a grievance for retaliation due to harassment by Mr. Donovan, Mr. Anderson, and Mr. Cheek for having previously filed a grievance for retaliation and for other past grievances.

55. Sometime later, Carlos Lopez became Plaintiff's new manager and Plaintiff was given extra assignments and treated differently than other employees in the same position.

56. Plaintiff was given a notice of suspension for the work performed by Plaintiff's subordinate, in which Plaintiff was not involved.

57. At this point, Plaintiff was completely aware that Defendant was trying to push him out of employment or terminate him before his retirement date, wherein he would lose his hard-earned retirement benefits.

58. Because of the persistent harassment, hostile work environment, discrimination, and retaliation Plaintiff was dealing with at work, Plaintiff was again placed on leave by his doctor due to Anxiety Disorder and Panic Disorder. Plaintiff was removed from work until January 6, 2020, which was also the date his retirement benefits would begin.

59. Plaintiff attempted to fulfill his employment duties after his complaints to Defendant about the hostile workplace, harassment, discrimination, and retaliation. However, Defendant's harassing behavior continued and was a daily occurrence. Defendant took no steps to prevent or rectify the behavior. Based on this, on or about January 6, 2020, Plaintiff was forced to retire early because of the unendurable working conditions

60. Also, as a direct result of Defendant's actions, Plaintiff was forced to use approximately 700 hours of sick time due to the hostile work environment, discrimination, harassment, and retaliation for filing his grievances.

## VI.

## CONDITIONS PRECEDENT

61. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, and this Charge was duel filed with the Texas Workforce Commission.

62. The Charge was filed within 300 days after the discriminatory conduct.

63. The EEOC issued Plaintiff a right to sue letter on September 9, 2019.

64. The suit was filed within 90 days of receipt of the Right to Sue Letters from the EEOC on December 9, 2019.

65. Plaintiff has timely exhausted all of his administrative remedies.

## VII.

## CAUSES OF ACTION

**A.**   **Cause of Action—Discrimination—Title VII**

66. Plaintiff incorporates each of the foregoing paragraphs.

67. Defendant discriminated against Plaintiff because of Plaintiff's race.

68. Defendant's actions violated 42 U.S.C. § 2000e-2(a).

**B.**   **Cause of Action—Wrongful Termination—Discrimination—Title VII**

69. Plaintiff incorporates each of the foregoing paragraphs.

70. Defendant constructively discharged Plaintiff's employment because of Plaintiff's race.

71. Defendant's actions violated 42 U.S.C. § 2000e-2(a).

**C.**   **Cause of Action—Unlawful Retaliation—Title VII**

72. Plaintiff incorporates each of the foregoing paragraphs.

73. Plaintiff engaged in protected activity as set forth in 42 U.S.C. § 2000e-3(a).

74. In response, Defendant retaliated against Plaintiff and ultimately constructively discharged Plaintiff's employment.

75. Defendant's actions violated 42 U.S.C. § 2000e-3(a).

## VIII.

## DAMAGES

76. Plaintiff incorporates each of the foregoing paragraphs.

77. Defendant's actions violated 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-3(a), which entitles Plaintiff to recover from Defendant back pay, front pay, as well as pre-judgment and post-judgment interest.

78. Plaintiff is also entitled to recover from Defendant compensatory damages as provided for under 42 U.S.C. § 1981a(a)(1).

79. Plaintiff seeks all damages available to him under federal law.

## IX.

## ATTORNEYS' FEES AND COSTS

80. Plaintiff incorporates each of the foregoing paragraphs.

81. Plaintiff retained the services of undersigned counsel to prosecute his claims.

82. Pursuant to 42 U.S.C. § 2000e-5(k), Plaintiff is entitled to recover a reasonable attorneys' fee from Defendant, including reasonable expert fees and costs.

## X.

## INJUNCTIVE AND DECLARATORY RELIEF

83. Plaintiff incorporates each of the foregoing paragraphs.

84. Plaintiff requests the Court enter an order providing injunctive and declaratory relief including, but not limited to:

    a. Prohibiting Defendant from engaging in unlawful discrimination;

    b. Reinstating Plaintiff's employment with Defendant with backpay;

    c. Reporting to the Court on the manner of compliance with the terms of a final order issued by this Court;

    d. Paying court costs;

    e. A declaration that Defendant violated Plaintiff's rights under state and federal law, engaged in unlawful employment discrimination, and considered an illegal factor in terminating Plaintiff's employment; and

      f.      Any additional equitable relief as the Court deems proper.

## XI.

## RESPONDEAT SUPERIOR

85. Plaintiff incorporates each of the foregoing paragraphs.

86. Defendant is liable for the acts and/or omissions of their respective agents, representatives, employees, servants, and officers.

## XII.

## JURY DEMAND

87. Plaintiff demands a trial by jury.

## XIII.

## CONCLUSION AND PRAYER

88. Plaintiff respectfully requests that Defendant be cited to appear and answer, and that upon final trial of this matter, the Court enter judgment awarding Plaintiff:

    A.    Back pay and front pay (including benefits);

    B.    Compensatory damages;

    C.    Injunctive and declaratory relief, including but not limited to, an Order:

        a.    Prohibiting Defendant from engaging in unlawful discrimination;

        b.    Reinstating Plaintiff's employment with Defendant with backpay;

        c.    Reporting to the Court on the manner of compliance with the terms of a final order issued by this Court;

        d.    Paying court costs;

        e.    A declaration that Defendant violated Plaintiff's rights under state and federal law, engaged in unlawful employment discrimination, and considered an illegal

        factor in constructively discharging Plaintiff's employment; and

    f. Any additional equitable relief the Court deems proper;

  D. Courts costs;

  E. Pre-judgment and post-judgment interest at the rate set by law; and

  F. All legal or equitable relief this Court deems proper.

Dated: October 6, 2020      Respectfully submitted,

            */s/ Brittney L. Thompson*
            JAMIE J. GILMORE
            Texas Bar No. 24045262
            jgilmore@galyen.com
            BRITTNEY THOMPSON
            Texas Bar No. 24104618
            bthompson@galyen.com
            BAILEY & GALYEN
            1300 Summit Avenue, Suite 650
            Fort Worth, Texas 76102
            Telephone: 817-276-6000
            Facsimile: 817-276-6010

            **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

  I certify that on October 6, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to all counsel of record.

            */s/ Brittney L. Thompson*
            BRITTNEY L. THOMPSON